# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JOHNNY MARTELL BROWN,

Defendant.

Case No. 23-cr-34-CJW

REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO
SUPPRESS

---

## I.    INTRODUCTION

On May 3, 2023, the Grand Jury returned an Indictment charging Defendant with one count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(3), and 924(a)(8) and one count of Possession of a Stolen Firearm in violation of 18 U.S.C. Sections 922(j) and 924(a)(2). (Doc. 3.)

The matter before me is Defendant's motion to suppress.[1] (Doc. 42.) The motion contained an inventory of items to be suppressed which includes, by reference to parts of a Cedar Rapids Police report, a Smith and Wesson handgun, marijuana, drug paraphernalia, a T-shirt, DNA swabs, and evidence of test fires from the handgun. (Doc. 42-1.) Defendant also seeks to suppress any statements Defendant made to law

---

[1] Initially, Defendant filed his motion to suppress on June 13, 2023. (Doc. 22.) A hearing on the motion to suppress was set for June 28, 2023. (Doc. 26.) On June 20, 2023, the Government filed a resistance to the suppression motion. (Doc. 29.) On June 21, 2023, Defendant filed a Motion to Withdraw Motion to Suppress Without Prejudice. (Doc. 30.) Defendant's motion was granted and the motion to suppress was withdrawn without prejudice. The hearing set for June 28, 2023 was also canceled. (Doc. 31.) On July 26, Defendant filed a Motion for Leave to Re-File Motion to Suppress, which was granted. (Doc. 39, 41.)

1

enforcement.[2]  (Doc. 42.)  All of this evidence was seized during or related to a vehicle stop on December 16, 2022 in Cedar Rapids, Iowa.  (Doc. 42.)  The Government timely filed a response.  (Doc. 46.)  The Honorable C.J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on August 8, 2023.  (Doc. 48.)

The motion arises from law enforcement's stop and subsequent search of Defendant's vehicle.

At the hearing, the following Government exhibits were admitted without objection:

1.      Dashboard camera video from Sergeant Blake Crutchley's patrol vehicle;

2.      Screen shot of video from Sergeant Crutchley's patrol vehicle;

3.      Google map print out of the path Defendant traveled;

4.      Body camera video from Sergeant Crutchley; and

5.      Video from backseat of Sergeant Crutchley's patrol vehicle.

The Government called one witnesses: Sergeant Blake Crutchley.  I found the witness credible.  For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.      *FINDINGS OF FACT*

On December 16, 2022, at approximately 6:35 p.m., Cedar Rapids Police Sergeant Blake Crutchley observed a traffic violation at First Avenue and 27th Street East in Cedar Rapids, Iowa.[3]  Sergeant Crutchley first observed Defendant's vehicle, a black

---

[2] At the hearing, defense counsel highlighted two specific statements Defendant made while seated in the back of a patrol vehicle but broadened the request to any statements made to law enforcement at the scene of the traffic stop and at the police station.  Defendant also added that he seeks to suppress approximately $7,200 found in the glove compartment of his vehicle.

[3] Officer Crutchley graduated from the Iowa Law Enforcement Academy in 2008 and has been a police officer for 15 years.  He is currently a patrol sergeant for the Cedar Rapids Police Department and supervises 5-10 patrol officers.

2

Dodge Charger with Minnesota license plates, while patrolling B Avenue and 16th Street Northeast in Cedar Rapids. Sergeant Crutchley's interest in the Charger was triggered by the absence of a front license plate. Sergeant Crutchley turned around to follow the Charger, but he did not notice anything about the driver or notice any traffic violations until the Charger turned onto First Avenue.[4]

Specifically, Sergeant Crutchley observed the Charger make a right-hand turn from 27th Street East onto westbound First Avenue, proceeding directly into the left lane instead of turning into the first available right lane. Sergeant Crutchley testified that, at the time of the traffic violation, it was very cold with light snow. However, he did not observe any obstacle in the closest right lane, any black ice in the closest right lane, or any issues with visibility. (Crutchley Hr'g Test. at 5; Gov. Exhibit 1 at 00:19-00:26.) Further, Sergeant Crutchley testified that he was following the Charger and was able to turn into the closest available right lane without any issues. (Crutchley Hr'g Test. at 6.)

While following the Charger, Sergeant Crutchley observed a second alleged traffic violation. The Charger was traveling westbound on First Avenue and briefly drifted over what Sergeant Crutchley referred to as the "center yellow line" or the "yellow line" and then back. (*Id.* at 7.) In the area in question, First Avenue consists of two lanes in both directions and a common center turn lane. A driver from either direction can move from the regularly traveled portion of the street into the center lane and then exit First Avenue by a lefthand turn across the oncoming lanes. The purpose of the turn lane is signified with large, curved arrows that point in opposite directions that are painted in white on the pavement. The turn lane is bounded on either side by solid yellow lines and, just inside those solid lines, dashed yellow lines. There is no line or other marker showing

---

[4] I sensed from defense counsel's thorough and careful cross-examination that he was exploring the possibility that Sergeant Crutchley's decision to follow Defendant was motivated by an illegal or improper purpose. If so, no such motive was expressly identified, much less established.

the center of the street. This generally describes the markings along the route in question. The markings vary at significant intersections (e.g., 27th Street, Cottage Grove Avenue, and 19th Street.) [5]

From Sergeant Crutchley's testimony, the video, and the foregoing description of the turn lane, I conclude that the Charger did not cross the center line of First Avenue as it entered the turn lane. Rather, the Charger's driver's side tires crossed the solid yellow line of the turn lane closest to the interior westbound lane (and perhaps the dashed yellow line) and then returned to the nearest westbound lane of travel. Sergeant Crutchley testified that he observed no obstacles in the road and knew no reason that prevented the Charger from continuing within the bounds of its lane. (*Id.* at 8; Gov. Exhibit 1 at 00:41-00:48.)

A third traffic violation allegedly occurred while Sergeant Crutchley was following the Charger. Government Exhibit 2 is a screenshot from Sergeant Crutchley's in-car audio and video recording system, which shows that at 6:35:51 p.m., Sergeant Crutchley's speed was 36 miles per hour, one mile per hour over the posted 35 miles per hour speed limit on First Avenue. Sergeant Crutchley testified that while he was following the Charger, he was pacing the vehicle, meaning that the Charger was also traveling 36 miles per hour. [6] (Crutchley Hr'g Test. At 9.)

Sergeant Crutchley also testified about an alleged fourth traffic violation. The Charger, while traveling southbound on 19th Street and approaching Second Avenue SE,

---

[5] The record did not contain a good description of the center lane. After the hearing, I emailed the parties and asked if they objected to my taking judicial notice of this description of the turn lane. The parties responded that they had no objection to the inclusion of this description.

[6] Sergeant Crutchley indicated that pacing was a technique he routinely employed as a patrol officer. (Crutchley Hr'g Test. at 9.)

4

came to a complete stop even though there was no stop sign at Second Avenue SE.[7]  (*Id.* at 10; Gov. Exhibit 1 at 01:20-01:29.)

Ultimately, Sergeant Crutchley pulled the Charger over.  Sergeant Crutchley made contact with the driver, Defendant.  Also in the Charger were Arterria Lipsey in the front passenger seat and two small children in the back of the vehicle.  Defendant was identified via an Iowa ID card.  Sergeant Crutchley ran the ID card, which showed Defendant had a suspended driver's license.  Upon approaching the vehicle a second time, Sergeant Crutchley detected the odor of raw marijuana.  Sergeant Crutchley also noticed that the sunroof on the Charger was open, which was unusual given that it was very cold and snowing.[8]  Further, Sergeant Crutchley observed a small amount of "shake" or marijuana remnants on Defendant's left pant leg.  Sergeant Crutchley asked Defendant to step out of the Charger.  Defendant refused.  Fearing that Defendant might attempt drive off, Sergeant Crutchley tried to open the Charger's door from the outside.  However, the door was locked, and Sergeant Crutchley reached through the open window and opened the door from the inside.  Eventually, Defendant exited the vehicle.  (Crutchley Hr'g Test. At 10-13.)

When Defendant exited the Charger, Sergeant Crutchley could smell marijuana emanating from Defendant's person.  Defendant admitted smoking marijuana and stated, "I smoke weed, bro."  Law enforcement searched the Charger.  Under the hood of the Charger, officers found a stolen firearm wrapped in a white T-shirt.  When officers found the handgun, Defendant was seated in the back of a patrol car and stated, "They just

---

[7] Sergeant Crutchley's dash camera shows that another vehicle traveling in front of the Charger appeared to stop in front of the Charger which may have caused the Charger to come to a complete stop on 19th Street.  (Gov. Exhibit 1 at 01:20-01:29.)

[8] Sergeant Crutchley testified that, based on his training and experience, the sunroof may have been open to ventilate the odor of marijuana.  (Crutchley Hr'g Test. at 12.)

found the pipe."[9]  Defendant was also searched.  Law enforcement found a Cheetos bag stuffed down Defendant's pants which contained 41 grams of marijuana.  (*Id.* at 13-15.)

At the police station, Defendant gave a post-*Miranda* interview.  Defendant made no admissions regarding the firearm but told law enforcement that he had purchased the marijuana earlier that day.  Further, Defendant stated that he smoked a lot of marijuana. He also admitted having gone to prison for distributing heroin.  Finally, Defendant stated that he regularly drove the Charger.  (*Id.* at 15-16.)

### III.    DISCUSSION

#### A.    Parties' Arguments

Defendant argues that Sergeant Crutchley "lacked grounds to conduct a traffic stop."  (Doc. 43 at 2.)  Specifically, Defendant asserts that "[n]either the right turn performed by Defendant onto First Avenue nor the slight crossing over the center dividing line for a brief moment constituted probable cause to conduct a seizure under the Fourth Amendment."  (*Id.* at 3.)  Defendant contends that Iowa Code Section 321.311 is only violated if an individual can safely make a right turn into the rightmost lane in a practical manner and fails to do so.  (*Id.*)  Defendant asserts that, "[p]resumably . . . because it was snowing at night time there was a high potential for black ice on the road and because he needed to immediately make a left turn . . . after making his right turn, making a safe turn into the outside right lane was impracticable"; and, therefore, "the only practical option available . . . was to turn onto First Avenue in the inside lane left and immediately activate his turn signal to indicate that he intended to turn left off of First Avenue."  (*Id.* at 3-4.)  Defendant maintains that a "reasonable police officer" would determine that his action was the "most practicable method" for turning onto First Avenue.  (*Id.* at 4.) Defendant argues that "there was insufficient cause to stop [him] because no law had

---

[9] Sergeant Crutchley testified that "pipe" is a common street term for a gun.  (Crutchley Hr'g Test. at 15.)

been violated." (*Id.*)  Defendant also argues that "there was no way for an officer to reasonably believe that the Defendant's momentary crossing over the edge line was not done to avoid snow or ice on the road" and therefore, "[i]t follows that this brief crossing of the edge line did not constitute probable cause for a reasonable traffic stop." (*Id.*)

Further, Defendant argues that the search of his vehicle's engine compartment was unlawful.  (*Id.*)  Relying on *United States v. Parker*, 72 F.3d 1444 (10th Cir. 1995), Defendant asserts that "the odor of marijuana in the passenger compartment of a vehicle, standing alone, does not establish probable cause to search the vehicle further than the passenger compartment." (*Id.* at 4-5.)  Defendant maintains that "[l]aw enforcement asserted that they detected the odor of marijuana, but to possess probable cause to search more than the passenger cabin of the vehicle, officers needed to find physical evidence of marijuana or detect an odor marijuana from the engine compartment." (*Id.* at 5.) Defendant contends that, "[w]ithout more than the smell of marijuana, law enforcement lacked probable cause to search the engine compartment." (*Id.*)

The Government argues that Sergeant Crutchley had probable cause to stop Defendant's vehicle. (Doc. 46-1 at 5.)  Specifically, the Government argues that Sergeant Crutchley observed several traffic violations which gave him probable cause to stop Defendant's vehicle.  (*Id.* at 6.)  First, the Government points out that Defendant made an improper turn onto First Avenue, where Defendant turned into the left lane instead of the closest available right lane in violation of Iowa Code Section 321.311.  (*Id.*)  The Government maintains that it was practical to turn into the right lane instead of the left lane because there were "no obstacles, such as black ice, blocking the road in the right lane" and Sergeant Crutchley was able to properly turn into the right lane without any difficulty.  (*Id.*)  Second, the Government points out that, when Defendant crossed the center yellow line, he violated Iowa Code Sections 321.297(1) and (3).  (*Id.* at 7.)  The Government maintains that Sergeant Crutchley observed no "evidence of an obstruction

7

that would justify [D]efendant crossing the center yellow line." (*Id.*) Third, the Government notes that Defendant violated Iowa Code Section 321.285(3), which prohibits speeding, because Defendant was driving 36 miles per hour in a 35 mile per hour zone. (*Id.* at 8-9.) Fourth, the Government contends that Defendant violated Iowa Code Section 321.358(3) by coming to a complete stop at the intersection of 19th Street and Second Avenue SE even though there was no stop sign or traffic light. (*Id.* at 9.)

The Government also argues that law enforcement had probable cause to search Defendant's vehicle. (*Id.*) The Government maintains that probable cause was based on the odor of marijuana emanating from Defendant's vehicle and Defendant's person, marijuana observed on Defendant's person, Defendant's statement, "I smoke weed, bro," and Defendant's resistance to exiting the vehicle. (*Id.* at 10.) The Government concludes that based on the odor of marijuana emanating from Defendant's vehicle, law enforcement had probable cause to search the entire car for contraband. (*Id.* at 11.)

**B.      Relevant Law**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted).  "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Officers may only conduct investigatory stops if they have reasonable suspicion that

criminal activity may be afoot. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).

In the context of traffic violations, a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)). An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. *Id*.

Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). However, courts have long recognized the "automobile exception" to the Fourth Amendment. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003); *see generally Carroll v. United States*, 267 U.S. 132, 158-59 (1925). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Kennedy*, 427 F.3d at 1140-41 (citations omitted); *see also United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006) ("The warrantless search of a vehicle is constitutional pursuant to the automobile exception to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other

9

evidence before the search began.") (Quotation omitted)). The burden is on the Government to justify warrantless searches. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d at 287-88.

*C.    Analysis*

*1.    Turning onto First Avenue*

Sergeant Crutchley had probable cause to stop Defendant's vehicle based on the turn onto First Avenue. Iowa Code Section 321.311(1)(a) provides in pertinent part that:

1. The driver of a vehicle intending to turn at an intersection shall do as follows:

a. Both the approach for a right turn and right turn shall be made as close as practical to the right-hand curb or edge of the roadway.

Here, the dash camera video shows that Defendant turned into the left lane instead of the closest available right lane in violation of Iowa Code Section 321.311. (Crutchley Hr'g Test. at 5; Gov. Exhibit 1 at 00:19-00:26.) Defendant concludes that, due to the weather

conditions and possibility of black ice, the only practical course of action was to turn into the left lane instead of the closest available right lane. In fact, on cross examination, Sergeant Crutchley admitted that in the presence of black ice making a sharper turn to enter the closest lane would increase the likelihood of the vehicle spinning out or fishtailing. (Crutchley Hr'g Test. at 17.) However, there is no evidence that snow or black ice made turning into the closest available right lane impractical. (Doc. 43 at 3-4.) Furthermore, Sergeant Crutchley testified that he did not observe any obstacles in the closest available right lane, he did not observe any black ice in the closest available right lane, and he did not observe that the snow or any impaired visibility would make turning into the closest right available lane impracticable. (Crutchley Hr'g Test. at 5.) Moreover, Sergeant Crutchley, who was immediately behind Defendant, was able to turn into the closest available right lane without any difficulty. (Crutchley Hr'g Test. at 6.)

It is somewhat unclear how or if Defendant relies on *State v. Tague*, 676 N.W.2d 197 (Iowa 2004) for the argument that "it is only if Defendant could have safely made his right turn onto First Avenue in the rightmost lane in a practical manner and failed to do so, that such failure would constitute a violation of Iowa law." (Doc. 43 at 3.) Regardless, such reliance is misplaced. Defendant asserts:

> Pursuant to Iowa Code § 321.311 (2021), a right turn shall be made "as close as practical" to the right-hand curb or edge of the roadway. The Iowa Supreme Court explained the intention of 321.311 as follows: "The dual purpose of the statute is to promote the integrity of the lane markings on the highway and to ensure the safe movement of vehicles on laned roadways. A violation does not occur unless the driver changes lanes before the driver ascertains that he or she could make such movement with safety." *Tague*, 676 N.W.2d at 203.

The language Defendant relies on in *Tague* does not discuss Iowa Code Section 321.311, but instead relates to and interprets Iowa Code Section 321.306. *See Tague*, 676 N.W.2d at 203. Thus, based on the Defendant's failure to enter the right-hand lane of First

Avenue, I find that Sergeant Crutchley had probable cause to stop Defendant based on his violation of Iowa Code Section 321.311(1)(a).

### 2. Crossing into the Turn Lane

Whether Defendant committed a law violation by allowing the Charger's driver's side tires to cross into the turn lane is a more difficult question. The Government relies on Iowa Code Sections 321.297(1) and (3). Section 321.297(1) provides that "A vehicle shall be driven upon the right half of the roadway upon all roadways of sufficient width[.]" An exception to Section 321.297(1) provides that "When an obstruction exists making it necessary to drive to the left of the center of the roadway, provided, any person so doing shall yield the right of way to all vehicles traveling in the proper direction upon the unobstructed portion of the roadway within such distance as to constitute an immediate hazard." Iowa Code Section 321.297(1)(b). Further, Section 321.297(3) provides that:

> A vehicle shall not be driven upon any roadway having four or more lanes for moving traffic and providing for two-way movement of traffic, to the left of the center line of the roadway, except when authorized by official traffic-control devices designating certain lanes to the left side of the center of the roadway for use by traffic not otherwise permitted to use such lanes, or except as permitted under subsection 1, paragraph "b." This subsection shall not be construed as prohibiting the crossing of the center line in making a left turn into or from an alley, private road, or driveway.

In *Tague*, the Iowa Supreme Court explained the meaning of these statutory provisions:

> The clear meaning from the plain language of the entire statute is readily ascertainable. *Section 321.297 prohibits an operator of a motor vehicle to drive his or her vehicle left of center, unless an exception exists under the statute.* Section 321.297(3) is the specific section of the statute applicable to [the defendant's] conduct on the night of the stop, because [the road] was a "roadway having four or more lanes for moving traffic and providing for two-way movement of traffic." Section 321.297(3) prohibits [the defendant] from driving to the left of the center line of [the road].

676 N.W.2d at 202 (emphasis added).

In compliance with Iowa Code section 321.252, the Iowa Department of Transportation adopted the Manual on Uniform Traffic Control Devices ("MUTCD"). The MUTCD defines edge line markings as "white or yellow pavement marking lines that delineate the right or left edge(s) of a traveled way." *Id*. § 1A.13(21). In *Tague*, the road in question was a four-lane highway with a painted median dividing the northbound and southbound lanes. 676 N.W.2d at 200. A police officer observed the defendant's left tires cross over the left edge line of the road and return to the roadway. *Id*. The Iowa Supreme Court determined that:

> The line that [the defendant's] vehicle crossed was an edge line marking, not the center line of [the road]. A median divided the northbound traffic from the southbound traffic on [the road]. For purposes of Iowa Code section 321.297(3), the median was the center line. [The defendant] did not drive his vehicle "to the left of the center line of the roadway," which is the conduct prohibited by section 321.297(3). Therefore, [the defendant's] momentary crossing of the edge line did not give the officer probable cause to stop [the defendant] for a traffic violation under section 321.297.

*Id*. at 203.

In the instant case, it is undisputed and the dash camera video shows that, while on First Avenue, Defendant's tires briefly drifted over the yellow line into the center turning lane and then back into the closest westbound lane. (Gov. Exhibit 1 at 00:41-00:48.) At the hearing, defense counsel pointed out that it appeared there was a manhole "hugging the center yellow line," indicating that the manhole may have caused Defendant to briefly cross the "yellow center yellow line." (Hr'g Test. at 37.) Although many of the questions and Sergeant Crutchley's answers referred to the "yellow center line," there is no visible line, yellow or otherwise, at the center of First Avenue in this location. I conclude this language is merely an imprecise description of what is shown on the video, i.e., that the tires of the Charger cross the yellow line that marks the turn lane. The

13

video does not show the Charger enter the turn lane far enough to cross the center line of First Avenue.

Sergeant Crutchley acknowledged that there may have been a manhole on the road but he did not notice it and did not observe any other obstacles that would have prevented Defendant from continuing within the bounds of his lane. (Crutchley Hr'g Test. at 8, 37-38, 56.) Regardless of whether there was a manhole in the road, Sergeant Crutchley observed Defendant cross the yellow line without noticing any obstacles or reason for doing so.

The instant case differs from *Tague* in that the Charger's tires crossed into what the MUTCD seems to call a "Two-Way Left-Turn Lane"[10] rather than a painted median. *Tague*, without explanation, declared that "[f]or purposes of Iowa Code section 321.297(3), the median was the center line." *Tague*, 676 N.W.2d at 203. Here, the Charger did not cross the center line of First Avenue, much less enter the oncoming eastbound lanes. Thus, *Tague* supports the conclusion that Defendant did not commit a violation of Section 321.297(1) regardless of exceptions (a) – (d) because the Charger stayed on the right half of the roadway at all times—even when it crossed the yellow line. Thus, the allegation Defendant violated Section 321.297(1) cannot support probable cause.

The Government also contends that Defendant violated Section 321.297(3). I respectfully disagree. In fact, this section seems to authorize a driver in Defendant's position to enter the turn lane and, in fact, to cross the center line. As discussed above, this section provides:

> A vehicle shall not be driven upon any roadway having four or more lanes for moving traffic and providing for two-way movement of traffic, to the left of the center line of the roadway, except when authorized by official traffic-control devices designating certain lanes to the left side of the center

---

[10] https://mutcd.fhwa.dot.gov/pdfs/2009r1r2r3/mutcd2009r1r2r3edition.pdf at 358.

of the roadway for use by traffic not otherwise permitted to use such lanes, or except as permitted under subsection 1, paragraph "*b*." This subsection shall not be construed as prohibiting the crossing of the center line in making a left turn into or from an alley, private road, or driveway.

Iowa Code § 321.297(3). The Government argues, "This law applies because First Avenue has five lanes of traffic. There were no official traffic-control devices designating certain lanes to the left side of the center of the roadway as available for defendant to use. Here, defendant's crossing of the center yellow line violated state law." (Doc. 46-1 at 8.) On the contrary, the designation of the turn lane is what makes it permissible for a driver in Defendant's position to enter the turn lane and drive left of center. Because the turn lane appears to be centered within First Avenue, a vehicle using that lane would likely be traveling left of center. Regardless of how much the turn lane impinges on the eastbound half of the roadway or how far the vehicle enters it, Defendant's presence in the turn lane is authorized by the lane markings. Although it may be inadvisable to drift in and out of a center turn lane, the Government has not pointed to any authority that makes it illegal. Therefore, Defendant's brief crossing of the yellow line did not give Sergeant Crutchley probable cause to stop Defendant's vehicle based on a violation of Iowa Code Section 321.297(3).

### 3.    *The Stop on 19th Street*

Turning to Defendant's alleged improper stop on 19th Street, the Government relies on Iowa Code Section 321.358(3) which provides in pertinent part:

No person shall stop . . . a vehicle, except when necessary to avoid conflict with other traffic or in compliance with the directions of a police officer or traffic-control device, in any of the following places:
. . .
3. *Within an intersection*. . . .

(Emphasis added.) Here, Sergeant Crutchley testified Defendant came to a complete stop on 19th Street "[a]t Second Avenue" where there is no stop sign or stop light. (Crutchley

Hr'g Test. at 32-33.) The dash camera, however, also shows another vehicle in front of Defendant that appears to stop, presumably causing Defendant to stop his vehicle. (Gov. Exhibit 1 at 01:20-01:29.) Sergeant Crutchley testified that "[t]he view of the truck in front of [Defendant] was obstructed, so I don't know if they came to a complete stop. If they came to a complete stop, [Defendant] would have had to as well so as to not to hit him, but once the truck pulled away, the defendant could have proceeded." (Crutchley Hr'g Test. at 56.) Sergeant Crutchley also testified that "[a]fter the truck pulled away, [Defendant] then moved up and stopped *as if there was a stop sign there*," which Sergeant Crutchley believed could be seen in the video. (*Id.* at 63) (emphasis added.) Sergeant Crutchley's observation that Defendant came to a complete stop "as if there was a stop sign there" is not consistent with stopping "[w]ithin an intersection" as prohibited by the Iowa Code. Moreover, there is no evidence that Defendant's stop occurred within the intersection itself. Thus, this incident did not give Sergeant Crutchley probable cause to stop Defendant.

### 4. *Speeding*

Finally, even though he was pacing Defendant's vehicle, Sergeant Crutchley testified that, at the time of the stop, he did not know what speed Defendant's vehicle was traveling and only learned that Defendant was traveling 36 miles per hour after reviewing the dash camera video. (*Id.* at 41.) Specifically, Sergeant Crutchley stated, "I knew I was pacing, but I did not know the speed[.]" (*Id.* at 42.) Furthermore, in response to the following question from the Court, "So the speeding didn't form any part of your justification for stopping the defendant; is that correct?" Sergeant Crutchley responded, "That's correct." (Hr'g Test. At 62.) Because at the time of the stop, Sergeant Crutchley did not know (from pacing) Defendant's speed, and, because Sergeant Crutchley did not base the stop on Defendant's alleged speeding violation, I find that

Defendant's alleged speeding violation did not provide Sergeant Crutchley with probable cause to stop Defendant.

### 5.    *Summary of Traffic Violations*

On cross-examination, Sergeant Crutchley testified that at the time of the stop, the alleged traffic violations for the improper turn and crossing the yellow line were the only bases for stopping Defendant's vehicle. (Crutchley Hr'g Test. At 42.) Defendant appeared to violate Iowa Code Section 321.311(1)(a) by making an improper turn into the left lane when the rightmost lane was open and free of any obstacles, which violation alone gave Sergeant Crutchley probable cause to stop Defendant. *See Whren v. United States*, 517 U.S. at 810; *Sallis*, 507 F.3d at 649. The other alleged traffic violations relied upon by the Government—crossing the yellow line, speeding, and coming to a complete stop where there was no stop sign—did not give him probable cause to stop Defendant. To the extent that Defendant was speeding, traveling 36 miles per hour in a 35 mile per hour zone, Sergeant Crutchley did not consider this in his determination to stop Defendant, and therefore, I find it irrelevant to the issue of whether Sergeant Crutchley had probable cause to stop Defendant.

### 6.    *Probable Cause to Search*

Sergeant Crutchley also had probable cause to search Defendant's vehicle. "As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception." *United States v. Mayo*, 627 F.3d 709, 713-14 (8th Cir. 2010) (*quoting United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). "Probable cause exists 'when given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence will be found in a particular place.'" *Id.* In *United States v. Merrett*, 8 F.4th 743 (8th Cir. 2021), the Eighth Circuit concisely articulated the "automobile exception" to the Fourth Amendment:

17

The Fourth Amendment requires law-enforcement officers to obtain a warrant before initiating a search, but "[d]uring a lawful investigatory [traffic] stop, officers may search a vehicle [without a warrant] when they develop probable cause to believe it contains contraband or evidence of criminal activity." *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020). During this traffic stop, officers smelled marijuana emanating from the SUV. And "[w]e have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception." *Id*. Thus, the officers' search of the SUV did not violate [the defendant's] Fourth Amendment rights.

*Id*. at 751.

Here, when he was pulled over, Defendant provided Sergeant Crutchley an Iowa ID card. After running Defendant's ID card, Sergeant Crutchley discovered Defendant's license was suspended and, upon return to Defendant's vehicle, he detected the odor of raw marijuana. Sergeant Crutchley also noticed that the sunroof on the Charger was open, which was unusual given that it was very cold and snowing outside. Based on his training and experience, Sergeant Crutchley believed that the sunroof may have been open to ventilate the odor of marijuana. (Crutchley Hr'g Test. at 12.) Sergeant Crutchley also observed a small amount of "shake" on Defendant's left pant leg. Upon exiting the vehicle and before the search of the vehicle, Sergeant Crutchley also could smell marijuana emanating from Defendant's person. Additionally, Defendant admitted smoking marijuana and stated, "I smoke weed, bro."

Taken together, I find that the foregoing provided Sergeant Crutchley probable cause to search Defendant's vehicle. *See Merrett*, 8 F.4th at 751 ("We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception") (quotation omitted); *United States v. Smith*, 990 F.3d 607, 612 (8th Cir. 2021) ("[B]ased on the smell of marijuana emanating from the car and the marijuana cigarette found in the passenger's jacket, the officers also had probable cause to search the entire vehicle for drugs and drug paraphernalia"); *United*

18

*States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011) (providing that the odor of marijuana from a vehicle and passenger in vehicle admitting smoking marijuana provided law enforcement with reasonable probability that marijuana was located inside the vehicle providing the officers with probable cause to search the vehicle).

Defendant's reliance on *United States v. Parker*, 72 F.3d 1444 (10th Cir. 1995) for the proposition that "the odor of marijuana in the passenger compartment of a vehicle, standing alone, does not establish probable cause to search the vehicle further than the passenger compartment," is misplaced. (Doc. 43 at 4-5.) In *Parker*, the Tenth Circuit explained that:

> If an officer smells marijuana in the passenger compartment of a vehicle, he has probable cause to search the passenger compartment. The odor of marijuana in the passenger compartment of a vehicle does not, however, standing alone, establish probable cause to search the trunk of the vehicle. Rather, an officer obtains probable cause to search the trunk of a vehicle once he smells marijuana in the passenger compartment and finds corroborating evidence of contraband.

72 F.3d at 1450. The Tenth Circuit standard is not binding on this Court. Indeed, *Parker* directly conflicts with Eighth Circuit precedent which holds that the odor of marijuana emanating from a vehicle establishes probable cause to search the entire vehicle. *See Smith*, 990 F.3d at 612 ("[B]ased on the smell of marijuana emanating from the car and the marijuana cigarette found in the passenger's jacket, the officers also had probable cause to search the entire vehicle for drugs and drug paraphernalia."). Moreover, even if *Parker* applied, Sergeant Crutchley did, in fact, find corroborating evidence of contraband when he saw marijuana remnants on Defendant's lap in the Charger. (Crutchley Hr'g Test. at 12.)

To the extent that defense counsel elicited testimony from Sergeant Crutchley that: (1) there was no smell of marijuana emanating from the engine compartment; (2) no smell of marijuana emanating from the white T-shirt; (3) he had never found marijuana in an

engine compartment; (4) engine compartments can reach 195 to 220 degrees; and (5) it is difficult to sell burnt marijuana, such testimony does not detract from Sergeant Crutchley's testimony or search of the vehicle in this case. (*Id*. at 47-50.) The speculation regarding the likelihood of Defendant secreting marijuana in an engine compartment is generally irrelevant under Eighth Circuit precedent. *See Smith*, 990 F.3d at 612. Even so, the elicited testimony did little to dispel the notion that marijuana could be secreted in an engine compartment for a short ride on a cold night or be properly insulated to avoid damaging it.

Accordingly, based on the totality of the circumstances, I find that Sergeant Crutchley had probable cause to initiate a traffic stop on Defendant for the improper turn onto First Avenue from 27th Street. I also find that Sergeant Crutchley had probable cause to search Defendant's vehicle. Therefore, I recommend that the motion to suppress the vehicle search be denied.

If the Court disagrees with me regarding the legality of the turn, I recommend suppressing the evidence. Alternatively, if the Court concludes one or more of the other alleged infractions created probable cause for the stop, the Court should deny Defendant's motion.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 42.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the

district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** at Cedar Rapids, Iowa, this 25th day of August, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa